# THE NORFOLK AND WESTERN RAILWAY COMPANY, a Corporation Incorporated Under the Laws of the State of Virginia, *vs.* BENJAMIN F. LANGDON.

*Bills of lading*: notice.   *Common carriers*: agreement as to
special route; route temporarily impracticable; shipment
of live stock; duty to feed and water; sale for
charges; when amounts to conversion; "per-
ishable freight" question for jury.
*Tender*: pleaded specially.

Where both parties, or their agents, sign a bill of lading, they
are both chargeable with notice of its contracts.        p. 270

Where a shipper contracts for a definite route, a departure
therefrom is a violation of the contract on the part of the
carrier; and the fact that immediate shipment over that
route is impracticable, as by a quarantine, imposes no legal
obligation on the part of the carrier to forward by a differ-
ent route.                        p. 272

The defense of tender must be specially pleaded and evidence
of a tender is not admissible under the general issue plea.
                                    p. 272

Where by a contract of shipment it is the duty of the shipper
to feed and water the live stock shipped, upon his failure so
to do, that duty falls upon the carrier, who will be entitled
to reimbursement by the shipper.                p. 273

Whether or not freight is to be regarded as "perishable" is a
question for the jury to determine.            p. 274

A special quarantine law prevented a carrier from delivering
to its destination a carload of hogs, and in consequence the
car was held on the road; the contract of shipment imposed
upon the shipper the duty of feeding and watering the stock;
this the shipper did not do; the carrier after caring for the

stock for a few days sold them where they were, a place of small demand and of low prices. *Held,* that under the special circumstances the sale was unauthorized and amounted to a conversion.                                       p. 274

*Decided June 12th, 1912.*

Appeal from the Circuit Court for Allegany County (HENDERSON, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, URNER and STOCKBRIDGE, JJ.

*Samuel B. Loose* and *J. Clarence Lane* (with whom were *Lane & Keedy* and *Albert A. Doub* on the brief), for the appellant.

*Frank G. Wagaman* (with whom were *Albert J. Long* and *Wagaman & Wagaman* on the brief), for the appellees.

STOCKBRIDGE, J., delivered the opinion of the Court.

This is a suit brought by Benjamin F. Langdon against the Norfolk and Western Railway Company to recover for the value of ninety-two hogs claimed to have been converted by the Railway Company. The circumstances out of which the action arises were as follows:

On the 28th day of November, 1908, the plaintiff loaded on a car of the defendant at Antietam, Maryland, ninety-two hogs, consigned to himself, in care of Louis C. Uhl, Union Stock Yards, Baltimore, Maryland. At the time of shipment there was issued to the plaintiff by the carrier a bill of lading, described therein as a uniform live stock contract, which recites that the rate given under the contract is lower than the rate made by the railway company for the transportation of stock at the carrier's risk and without limitation

of liability, and is based upon the conditions and agreements contained in the contract. This bill of lading was signed by the agent of the carrier, and also by the shipper, and both parties therefore were chargeable with notice of its contents, and of an assent or agreement to the provisions contained in it. Among those provisions occurs this: "That the said shipper is at his own risk and expense to load and take care of, and to feed and water said stock whilst being transported, and whether delayed in transit or otherwise, and to unload the same, and neither said carrier nor any connecting carrier is to be under any liability or duty with reference thereto, except in the actual transportation of the same." This bill of lading issued by the defendant shows upon its face that the hogs were shipped in a car marked "N. & W. 25362," and also bore the initials "W. M.," which the witness testified, indicated the routing of the shipment as being over the line of the Norfolk and Western as far as Hagerstown, Maryland, where it was to be delivered to the Western Maryland Railroad as a connecting carrier, to complete the transportation to the point of ultimate determination.

On the 27th of November, 1908, there was issued by the Secretary of Agriculture a notice of quarantine, inhibiting the shipment of cattle, sheep, other ruminants and swine within certain specified territory, including the State of Maryland. This quarantine restriction, executed and promulgated on the 27th of November, 1908, and declared to be effective on and after that date, was unknown to Philip Grove, the agent of the defendant carrier at Antietam Station until about 5:45 P. M. on November 28th, the day the hogs were loaded, and some two hours after the hogs had been actually placed on the car. In the meantime Langdon, the shipper, had left for his home, and apparently it was not until about nine o'clock that evening that he received notice of this quarantine, and even then the agent, Grove, does not seem to have told the plaintiff positively that the hogs would be held up at Hagerstown, but said that they were liable to be held up at Hagerstown; and that he was not

sure that they would be so held, that he did not know but that the quarantine might be raised. Whether the train containing the car in which the hogs had been loaded, had then actually left Antietam Station, is not entirely clear, but apparently it had not. In this conversation over the telephone, Grove, the station agent, inquired what the plaintiff desired to have done with the hogs, to which he replied in substance that having delivered the hogs to the carrier, he had nothing more to do with them until they arrived in Baltimore, and did not care to know anything about them in the meantime.

The hogs left Antietam Station sometime during the night of the 28th November, and according to John W. Russell, the conductor of the freight train which hauled them, they reached Hagerstown about 4:30 A. M. on the morning of the 29th. Upon arrival there, the Western Maryland Railway Company refused to receive the hogs, notwithstanding repeated endeavors upon the part of the agent of the N. & W. to turn them over, and the ground of the refusal of the connecting carrier was that the line of that road passed from Maryland into Pennsylvania, and then back into Maryland, thus bringing the car load of hogs within the terms of the quarantine.

On the next day, November 30th, the hogs reached the Union Stock Yards at Hagerstown, and again the plaintiff was communicated with, to give some directions as to the disposition of the hogs; this communication was from two sources, a man by the name of Bolinger and one Macomb, both agents of the defendant. The exact date of the first of these conversations was either Monday, November 30, or Tuesday, December 1st; and a second telephonic conversation was had between Macomb and the plaintiff on December 3rd, in which the plaintiff again declined to take charge of or give directions as to the disposition of the hogs, saying that it was up to the railway company to deliver them according to the contract contained in the bill of lading.

The hogs having been thus unloaded at the stock yards in Hagerstown, were fed and held there from the 30th November until December 7th, when they were turned over by the manager of the stock yards acting under the directions of the agent of the defendant to one Henry Matthews, for sale, by whom they were subsequently sold at varying prices, less, however, than the market value of hogs in the City of Baltimore at that time, and subsequently the railway company offered to pay the plaintiff the net proceeds realized from such sales, which was declined, and the present action instituted.

Some of the suggestions contained in the briefs and arguments it is proper to advert to in passing. Thus it was intimated that the route by which the shipment was to be made was immaterial to the shipper, and that upon the refusal of the Western Maryland to accept the hogs they might have been shipped by way of the Baltimore and Ohio Railroad, and so enable the carrier to relieve itself of loss. With regard to this it is sufficient to say, that the parties had contracted with regard to a definite route, that a departure therefrom would have been a violation of the contract on the part of the carrier, and the fact that immediate shipment over the indicated route was impracticable, imposed no legal obligation on the carrier to forward by a different route. *Empire Trans. Co.* v. *Wallace,* 68 Pa. St. 302; *Fisher* v. *R. R. Co.,* 68 L. R. A. 390, 105 Am. St. Rep. 283; *Regan* v. *Railway,* 61 N. H. 581.

The first bill of exceptions taken was to the refusal of the trial Court to admit evidence of a tender on the part of the railway company of the net proceeds of the sale of the hogs. Such refusal was in accord with the previous rulings in this State. The defendant had not by its pleas set up any defense of tender and the rule as given in *Poe on Pleading,* sec. 611, is that a defense of tender must be specially pleaded, and cannot be shown under the general issue plea.

The remaining bill of exceptions relates to the ruling of the trial Court on the prayers, and involves the most important and vital question of the case.

Was or was not the defendant company warranted in causing the hogs to be sold as it did? If so, the plaintiff cannot recover; if not, then what is the proper measure of the defendant's liability? By the very terms of the contract of carriage, called a bill of lading, it was provided that the shipper should, "at his own sole risk and expense take care of, feed and water said stock while being transported, and whether delayed in transit or otherwise." No power of sale was given to the carrier, and here was a clear liability, assumed by the shipper, and if he refused to perform it, the duty was plain for the carrier to supply the requisite care, feed and water during the period of detention, and had it done so, it would have been entitled to be reimbursed by the shipper. A case closely analogous to the one under consideration was that of the *Great Northern Railway Co.* v. *Swaffield*, L. R. 9, Ex. 132, where the defendant had shipped a horse, consigned to himself at a small station on the line of the railway. Upon the arrival of the animal at the point of destination, there was no one present to receive it, and the company sent the horse to a stable. When a groom appeared a little later, demand was made of him that he pay the stable charges, which he refused, and the horse remained in the stable for some months. The railway company then paid the livery bill and brought suit to recover it from the consignee, and the recovery was allowed. The present is a much stronger case than the one just referred to, for the reason that there was no contractual obligation there that the shipper and consignee should care for the horse during the period of transportation. A case directly turning upon the non-existence in the contract of any power of sale was *Briggs* v. *Boston & Lowell R. R. Co.*, 88 Mass. 246, where a number of barrels of flour which had been wrongly addressed, and in consequence were missent. The flour was held by the railroad for two months, and then as the flour had begun to sour was sold by the carrier, but it was held liable for a conversion because no power of sale was given it in the contract for transportation.

The defendants also asked to be relieved of responsibility upon the ground of the perishable nature of the freight. In support of this view it relies on cases like that of *Butler* v. *Murray,* 30 N. Y. 88, where some hides shipped from Central America were found to be infested with worms after being loaded on board of a vessel, and were unloaded and sold by the Captain; and *Hull* v. *Mo. Pac. Ry. Co.,* 60 Mo. Ap. 593, where a carload of decaying oranges were refused by the consignee. But when freight is to be regarded as perishable is rather a question for the jury, and in the *Am. Ex. Co.* v. *Smith,* 33 Ohio State, 511, where a shipment of 54 boxes of peaches was delayed for several days by the washing out of a bridge on the line of the railroad transporting them, no recovery was allowed.

In the present case the carrier had a contract under which it could have claimed reimbursement for any cost that it might have been occasioned. There was no ground for presuming that the quarantine would be permanent or even of long duration, yet under these circumstances after a lapse of only seven days it ordered the hogs sold in a market where the demand was slight and the prices low. Without now deciding that in no event would a carrier be justified in making a sale, it is evident that the lapse of seven days created no such condition as could justify the disposal of the hogs at Hagerstown by a sale of them. The action of the company in disposing of the hogs amounted therefore to a conversion, 6 *Cyc.* 474-5, and cases there cited.

It follows from what has been said that the trial Court committed no error in granting the first prayer of the plaintiff, and in rejecting the first, second, third, fourth, fifth and seventh prayers of the defendant. The second prayer of the plaintiff and the sixth of the defendant were upon the measure of damages, and laid down substantially the same rule, and were properly granted. The judgment appealed from will therefore be affirmed.

> *Judgment affirmed, costs to be paid by the appellant.*